## THE PEOPLE *v.* JAMES SULLY.

Form of an indictment for obtaining the signature to a check, money, contracts and other valuable things by false pretenses.

On the trial of an indictment for obtaining property by false pretenses, it is competent to prove by the prosecutor, called as a witness in behalf of the People, that, in the transaction in question, he relied on the representations of the prisoner.

And where, on the trial of an indictment for obtaining property from C. by false pretenses, the representation made by the prisoner to C. was that there were no liens on the land except the mortgage then sold by the prisoner to C., while in fact there was a prior mortgage upon it, executed a few days before by M. to L., held that it was competent to prove that, at the time of the execution of the prior mortgage, M. told L., in the presence of the prisoner, that he, L., need not be in a hurry to get his mortgage recorded, on the ground that such testimony, in connection with other acts proved, tended to show a conspiracy

The People *v.* Sully.

with M., and an intent on the part of the prisoner to cheat and defraud when he subsequently made the false representation to C.

It is an offense within the statute against false pretenses to effect a sale of a mortgage on real estate by falsely, willfully and designedly representing and pretending, with intent to cheat and defraud, that it is the first lien on the mortgaged premises, and thereby obtain money or other valuable things from the purchaser.

The statutory offense is complete when a person is induced to put his signature to a written instrument, or to part.with his property, by a false pretense or representation as to an existing fact, willfully and designedly made for the purpose of obtaining such signature or property, with the intent to cheat and defraud him; and it is not necessary that the pretense or representation should be such that common prudence or ordinary care could have guarded against it, or that it should be accompanied by an "artful contrivance." It is sufficient if it be such that, if true, it would naturally, and according to the motives which influence an honest mind, lead directly to the result alleged.

It is sufficient if the pretense be proved in substance and effect. The precise words need not be used, and the pretense may be proved by the conduct and acts of the prisoner in connection with his statements.

It is not material to the question of jurisdiction of the court where the pretenses were made. The obtaining of the signature or property by means of them, with intent to cheat and defraud, completes the crime and determines the place of trial.

It is not essential, to convict under the statute, that actual loss or injury should be sustained. ·

JAMES SULLY was indicted at the Erie Oyer and Terminer for feloniously obtaining property by false pretenses. The indictment was as follows:

*State of New York, County of Erie, ss:*

The jurors of the People of the State of New York, in and for the county of Erie, upon their oath present: That James Sully, on the twenty-third day of June, in the year one thousand eight hundred and fifty-nine, at the city of Buffalo, aforesaid, feloniously devising and intending by unlawful ways and means to obtain and get into his possession the chattels, valuable things and personal property of one Trumbull Carey, and with intent feloniously to cheat and defraud the said Trumbull Carey, did then and there feloniously, knowingly and designedly, falsely pretend and represent to the said Trumbull Carey that a certain mortgage, hereinafter described, was a good and valid mortgage; that it was the only mort-

gage, lien or incumbrance of any kind upon the premises therein described; that there was no other mortgage, lien or incumbrance upon the premises described therein; that it was the first and only mortgage, lien or incumbrance upon the premises therein described, and was given for a part of the purchase-money of said premises, which said mortgage was dated the second day of June, in the year last aforesaid, and was executed by Enestus T. Cross, and Margaret Cross, his wife, of Alden, Erie county, to William M. Moulton of the same place, to secure the payment of the sum of four thousand and three hundred dollars, upon premises described therein as follows: "All that certain piece or parcel of land situate in the town of Darien, Genesee county, and State of New York, being part of lot number twenty-eight, in said town, bounded as follows, viz: Beginning at the southeast corner of said lot number twenty-eight, thence due west on the State road thirty chains and seventy-four links to John Van Ornam's east line, thence north fifty-eight chains eighty-nine links to lot number twenty-nine, thence east on the line of said lot thirty chains and seventy-four links, thence south on the east line of said lot number twenty-eight fifty-eight chains and eighty-nine links to the place of beginning, containing one hundred and eighty-six acres of land," and which said mortgage was recorded in the clerk's office of Genesee county, on the second day of June, in the year last aforesaid, in book number fifty-one of mortgages, on page two hundred and seventy-three. And the said Trumbull Carey then and there believing the said false pretenses and representations so made, as aforesaid, by the said James Sully, and being deceived thereby, was then and there induced by reason of the false pretenses and representations so made as aforesaid, to purchase the said mortgage, and the bond accompanying the same, executed by said Cross to said Moulton, bearing the same date, and for the payment of the same sum, and to give and deliver in payment therefor to said James Sully among other things his, said Carey's check, in writing, upon the Bank of Genesee, for two thousand dollars, and his contract in

The People *v.* Sully.

writing for the payment of the sum of one thousand dollars, and his other contract in writing, for the payment of the sum of four hundred and forty dollars; and the said Trumbull Carey did then and there deliver to the said James Sully, being induced by and by reason of the false pretenses and represent-ations so made as aforesaid, two thousand dollars in money, one thousand promissory notes, commonly called bank bills, made and issued by divers banks for the payment of divers different sums of money, amounting to and of the value of two thousand dollars (a more particular description of said bills are to the jurors aforesaid unknown), his written check for the payment of the sum of two thousand dollars, his con-tract in writing for the payment of one thousand dollars, and his other contract in writing for the payment of the sum of four hundred and forty dollars, which said check and con-tracts are in words and figures following, to wit:

$2,000.                              "BUFFALO, June 23, 1859.

Bank of .Genesee : Pay to the order of James Sully two thousand dollars, and charge to my account.

     (Signed)      T. CAREY."

$1,000.                              "BUFFALO, June 23, 1859.

In consideration of William M. Moulton's assignment to me of a mortgage against Enestus T. Cross, dated June 2d, 1859, of $4,300, I hereby agree to pay to said Moulton, or bearer, one thousand dollars and interest from date, when said amount has been paid in to me on said mortgage.

     (Signed)      T. CAREY."

$440.                              "BUFFALO, June 23, 1859.

In consideration of William M. Moulton's assignment to me of a mortgage against Enestus T. Cross, dated June 2d, 1859, for $4,300, I hereby agree to pay said Moulton, or bearer, the sum of four hundred and forty dollars, when a certain mort-gage given by Sely Kidder to Tisdal & Chatfield, in 1825, and recorded in Liber 6 of Mortgages, at page 19, in Genesee County Clerk's Office, is discharged.

     (Signed)      T. CAREY."

That said two thousand dollars in money, and said one thousand bank bills and said check, and said two contracts, and each and all of them, were then and there of the valuable things and personal property of said Trumbull Carey, and the said money and bank bills were of the value of two thousand dollars, and one of the said contracts was of the value of one thousand dollars, and the other of the value of four hundred and forty dollars, and the said check was of the value of two thousand dollars; that said Trumbull Carey was obliged to, and did afterwards, on the 24th day of June in the year last aforesaid, pay to said James Sully the sum of two thousand dollars in money on said check, and the said James Sully did then and there feloniously, knowingly and designedly, receive and obtain the aforesaid money, bank bills, check and two contracts of the valuable things and personal property of the said Trumbull Carey, by reason and means of the false pretenses and representations aforesaid, and with intent feloniously to cheat and defraud the said Trumbull Cary of the same; whereas, in fact and in truth, the said *mortgage was not then and there a good and valid mortgage*, but was utterly *invalid* and *worthless;* and, whereas, in truth and fact, said mortgage was not *a first mortgage and lien* upon the premises described therein; and, whereas, in fact and truth, said mortgage was not the only incumbrance on the said premises, but, on the contrary, there was then and there a mortgage on said premises to secure the payment of the sum of five thousand two hundred and fifty dollars, dated May the 6th, in the year last aforesaid, executed by said William M. Moulton to one Truman Luce, and was the *first and prior lien and incumbrance* on said premises, and the said James Sully then and there well knew that the said last mentioned mortgage was upon said premises, and that the same was the *first and prior lien* and incumbrance *thereon at the time* of his making the pretenses and representations aforesaid; and, whereas, in fact and truth, each and every of the pretenses and representations aforesaid, so made as aforesaid by said James Sully, were utterly false and untrue, and the said James Sully well knew that each and

every 'of the pretenses and representations, so made by him as aforesaid, were utterly false and untrue at the time of making the same, against the peace of the People of the State of New York and their dignity.

And the jurors aforesaid, on their oaths aforesaid, present, that James Sully, on the 23d day of June, in the year one thousand eight hundred and fifty-nine, at the city of Buffalo, in the county aforesaid, feloniously devising and intending, by unlawful ways and means, to obtain the signature of one Trumbull Carey to a certain written instrument, to wit: to a written instrument commonly called a bank check, which was and is in the words and figures following, to wit:

$2,000.                              "BUFFALO, *June 23d,* 1859.

BANK OF GENESEE: Pay to the order of James Sully two thousand dollars, and charge to my account."

Did then and there feloniously, unlawfully, knowingly and designedly, falsely pretend and represent to the said Trumbull Carey that a certain mortgage, hereinbefore particularly described and set forth in the first count of this indictment, was the only mortgage, lien or incumbrance of any kind upon the premises in said mortgage described; that there was no other mortgage, lien or incumbrance upon the premises therein described; that it was a first and only mortgage, lien or incumbrance upon the premises therein described, and was a *bona fide* mortgage, and given for a part of the purchase-money of said premises, and which said mortgage was executed by Enestus T. Cross and Margaret Cross, his wife, to William M. Moulton, and bears date June the second, in the year last aforesaid, and is to secure the payment of the sum of four thousand and three hundred dollars, and which said mortgage, and the premises described therein, are hereinbefore, in the first count of this indictment, particularly described and set forth; and the said Trumbull Carey, then and there believing the said false pretenses and representations so made as aforesaid by the said James Sully, and then and there believing the same, and being deceived thereby, was then and there induced, by reason of the false pretenses and representations aforesaid, so made as afore-

said, to purchase the mortgage aforesaid, and the bond accompanying the same, and to affix and write his name and signature to the aforesaid written instrument, commonly called a bank check, to wit, in the words and letters following: "T. Carey," which said check, with the signature of said Trumbull Carey thereon, obtained as aforesaid, the said James Sully took and obtained from said Carey, in part payment of the purchase-money for said mortgage and bond purchased as aforesaid; and the said James Sully did then and there feloniously, knowingly and designedly obtain the signature aforesaid of the said Trumbull Carey to the aforesaid written instrument, commonly called a bank check, by reason of the false pretenses and representations aforesaid, and with intent feloniously to cheat and defraud the said Trumbull Carey.

Whereas in fact, and in truth, said mortgage was not then and there the only mortgage, lien or incumbrance upon the premises therein described, and whereas in fact, and in truth, said mortgage was not then and there the first and only mortgage, lien or incumbrance upon the premises therein described, and was not a *bona fide* mortgage, given for part of the purchase-money, but, on the contrary, said mortgage was given without any consideration whatsoever, and was then and there wholly worthless, and there was then and there another mortgage upon said premises to secure the payment of the sum of five thousand two hundred and fifty dollars, dated the sixth day of May, in the year last aforesaid, executed and delivered by one William M. Moulton to one Truman Luce, and which mortgage was then and there the first mortgage upon the aforesaid premises, and was the first and prior lien and incumbrance thereon, and the said James Sully then and there well knew, at the time of his making the false pretenses and representations aforesaid, that the said last mentioned mortgage was upon the said premises, and was the first mortgage, lien and incumbrance thereon; and whereas in fact, and in truth, each and every of the pretenses and representations so made as aforesaid by the said James Sully were utterly false and untrue, and the said James Sully well knew that each and every of the pretenses

and representations so made by him as aforesaid, were utterly false and untrue, at the time of making the same, contrary to the form of the statute in such case made and provided, and against the peace of the People of the State of New York and their dignity.

J. M. HUMPHREY, *District Attorney.*

The defendant pleaded not guilty, and the issue was tried at a criminal term of the Superior Court of Buffalo, in February, 1860, the indictment having been sent to that court for trial by the Court of Oyer and Terminer.

On the trial, *Trumbull Carey* was called as a witness on the part of the People, and testified as follows: I live at Batavia, and have for 54 or 55 years; I know the prisoner; I became acquainted with him about a year ago, in the cars; he told me what his business was, an agency; I know the Kidder farm in Genesee county by reputation; I had negotiations with prisoner touching the purchase of a mortgage on that farm the fore part of last June; he called at my house at Batavia, and said he had a mortgage to sell; he had it with him (mortgage was shown to witness); this is the one; he also had a clerk's search with him (it is here shown to witness); this is it; that which is below the signature of the clerk was not then upon it; this is the bond accompanying the mortgage; he said it was a good mortgage, upon a farm in Darien, of 186 acres, which was free from incumbrances, except this mortgage; that there were no other incumbrances upon it but this mortgage; that it was the best kind of mortgage; a first class mortgage; that he came out there because persons in Buffalo did not like to buy mortgages on land in Genesee county; I told him I did not know enough about it to buy it; did not know enough about the premises; he asked what I would give for it if it was all as he said; I told him I would buy it at 20 per cent off; he dwelt upon the character of the mortgage considerably, and stated what I have already sworn to, over and over, in different words; I told him I would not buy it without knowing more of the value of the land; that I must see the land, or send some one

to see it first; nothing was consummated; the matter was left there, and there was no agreement for any future negotiation; he showed me the bond and mortgage and search; I did not examine them particularly; he took them away; I saw prisoner next about ten days after, at Batavia; he called at my house; I had discovered upon this search a prior mortgage by Kidder to Chatfield and Tisdall, of $300; I came to Buffalo between the first and second time I saw Sully, and saw Mr. Otto, who offered me the mortgage; I addressed him a note to send me the search; he did so a few days after; I asked Mr. Godfrey to go and appraise the farm; he came to my house, and, upon looking over the search there, we (Godfrey and witness) discovered this little mortgage of Kidder to Chatfield and Tisdall, given in 1825, and I then stopped Godfrey from going out to see the farm; the next day or so, Sully came out; I told him what I was going to do when I discovered this Kidder incumbrance; he asked where Godfrey lived; I told him, and he left, taking the papers with him; the next day Sully and Godfrey came to my house; they had been up to examine the land; Mr. Godfrey appraised the land so low I told Sully it was not sufficient; Sully took the papers and went away; while there he said the Kidder mortgage was paid; I told him, if so he could get it discharged; that Chatfield lived in Chicago; he said he would get a discharge; he showed me a bond of indemnity against that mortgage; it was sent out by Otto, and he mentioned it; prisoner said at this time that the Kidder mortgage was the only incumbrance on the land, and when it was discharged the land would be clear; I told him I should be in Buffalo next day; prisoner took the papers away with him; I came to Buffalo the next day or day after; prisoner called at my son's, Dr. Cary, and said he had come to make the security acceptable, by leaving part of the money; that Moulton was under the necessity of having $2,600 that day, which he wanted to pay on a contract for a farm, which, if he did not pay, he would lose some $1,200; I offered to give him $2,000 down, and a note for $1,000, payable when that amount should be paid upon the

The People *v.* Sully.

Cross mortgage, and $440 upon the discharge of the Kidder mortgage; he declined to take that; said Moulton wanted more money, and that he could do better; that it was a first class mortgage; I told him, very well, do so; upon reflection he said Moulton wanted the money so much, and that it would not be long before that amount would be got of Cross on his mortgage; I asked prisoner if it was all right; he said it was, and promised if it was not all right, he would make it right; he then made the writings, that is, the notes, and copies of them for me to keep; I drew a check; the assignment he had already made; this is the check; I asked to whom it should be payable, and he said to himself; this is the assignment, dated June 20; it was delivered on that occasion with the bond and mortgage; I never saw Moulton to know him until after the transaction; the assignment was acknowledged, and had the clerk's certificate upon it; I noticed the assignment bore date prior; prisoner said he had the assignment all drawn; I next saw my check at the Bank of Genesee, Batavia; I had money there, but not the amount of the check.

*Question by district attorney:* Did you rely upon the representations of the prisoner touching the Cross mortgage? Objected to, on the ground that it called for the secret mental emotions of the witness. Objection overruled. Prisoner's counsel excepted. *Ans.* I did. Prisoner also gave me the search at this time.

After a further examination,

*Truman Luce* was sworn on the part of the People, and testified: I will be seventy-two in March; I live in Lancaster, and have since 1810; I know the Kidder farm in Darien, Genesee county; I bought it of Kidder; I have seen prisoner frequently; I knew Moulton; I made his acquaintance about the first of May last; I had a negotiation for the sale of this farm to Moulton; I had made a contract with Harrington for it, and I told Moulton if he would perform that contract I would sell it to him; prisoner called upon me about the farm, and before I had any talk with Moulton about it, I told him I was under a written contract with Harrington, and he said he

could arrange it with Harrington; I think Sully called with
Moulton; I made a deed to Moulton; it was at my house;
Sully was there, my son-in-law and my wife; I had been hurt
very bad and could not go out; Moulton came in the after-
noon, and Sully came in the cars about 5 or 6 P. M.; prisoner
said he came to make out the papers, and had blanks with
him; I told Sully I could not give the deed; Sully drew the
deed from me to Moulton, and a bond and mortgage to me
from Moulton; Mr. Moulton went and got Mr. Grimes, the
justice of the peace, to come and take the acknowledgement
of the deed and mortgage; he took the acknowledgements;
the deed and the bond and mortgage were delivered there in
the presence of Sully.

The district attorney here offered to prove that upon this
occasion, in the presence of prisoner, Moulton told the witness,
Luce, that he, Luce, need not be in a hurry to get his mort-
gage recorded; that in the course of a week Moulton would
call upon Luce, and they would go together to the clerk's
office and have the deed and mortgage recorded. The counsel
for the prisoner objected to the admission of the evidence as
immaterial and irrelevant. The court overruled the objection,
and the prisoner excepted.

Moulton said he bought the farm for himself, and did not
intend to sell it; that in the course of next week he would
come and go with me to the clerk's office, at Buffalo, and get
the clerk's certificate to the deed and mortgage, and we could
go out to Batavia together and have them recorded; my son
was on the farm, and Moulton said he wanted the deed to show
to him, so that he would go off the farm; that he would bring
it back, and we could go together and get the certificate and
have it recorded; he said, you may take my deed and get it
recorded; I said I was not able to go, and I was not; Sully
was present; Moulton was to give me $30 an acre. The
balance above the mortgage was arranged there; Sully said
he was afraid the cars had left him; Moulton said if they had
he would take him to Buffalo in his wagon; it was about ten
o'clock when they left; the money paid was paid by Sully;

Moulton gave me his note for $81.50, and Sully indorsed it. (The bond and mortgage were here shown witness.) This is the bond and mortgage given to me; they were executed on the first day of June, but were dated back to the date of the contract; the next Monday after the first of June I came to Buffalo, and saw prisoner on the train, and afterwards at his office; I saw Moulton at Sully's office.

Further evidence was given, both for the prosecution and the defense.

After the evidence was closed the judge charged the jury· as follows:

On the first day of June, 1859, Truman Luce conveyed the Kidder farm to William M. Moulton, and at the same time Moulton executed and delivered to Luce his bond and mortgage upon the farm, to secure the payment of $5,250, being nearly the whole of the purchase-money. The deed of that farm from Luce to Moulton was recorded on the second day of June. The mortgage from Moulton to Luce was recorded on the tenth day of June. On the second day of June, Moulton executed to Cross a deed of the Kidder farm, and Cross at the same time executed his bond to Moulton and a mortgage on that farm to secure the payment of $4,300, and which last mentioned deed and mortgage were recorded on the second day of June. On the 23d day of June, Carey purchased the Cross bond and mortgage. The sale of them to him was negotiated by the prisoner. On the twenty-third day of June, at the city of Buffalo, prisoner delivered to Carey an assignment of them, and received from Carey his check of $2,000 on the Bank of Genesee; and on the same day the prisoner drew the money from that bank at Batavia, in the county of Genesee, upon this check. The assignment of the bond and mortgage to Carey was recorded on the 28th of June. The prisoner drew up all the said deeds, bonds and mortgages, and was present at the delivery, on the 1st of June, of the mortgage of Moulton to Luce, and knew of its existence. All these facts are not only established by the evidence, but are conceded by the counsel for the prisoner. The mort-·

gage from Moulton to Luce is, and ever has been, a prior lien upon the Kidder farm over the mortgage from Cross to Moulton. The prisoner cannot be convicted under the first count in the indictment, because the money was not obtained upon the check within the jurisdiction of this court. The agreement to pay one thousand dollars when it was received from the Cross mortgage is not within the statute. The only offense of which the prisoner can be convicted is under the second count, of obtaining the signature of Trumbull Carey to the check for $2,000 upon the Bank of Genesee.

Under the proofs which have been adduced before you, the material disputed questions of fact to be determined by you are:

1st. Did the prisoner, during the negotiation of the sale to Carey of the bond and mortgage made by Cross to Moulton, represent to Carey that that mortgage was the only mortgage, lien or incumbrance upon the Kidder farm, or that there was no other mortgage, lien or incumbrance thereon? If you shall find that he did so represent, I charge you that, under the circumstances of this case, such a representation is a pretense within our statute. To the portion of the charge "that under the circumstances of this case, such a representation is a pretense within our statute," the counsel for the prisoner excepted.

2d. Did Cary rely upon the representation? It is not necessary that he should have relied upon it solely. But you must be satisfied that it was a moving cause, and without which he would not have made the purchase of the bond and mortgage and signed and delivered the check.

3d. Was the representation made with a knowledge that it was false, and with intent to defraud? If you are satisfied that the representation was made with an intent to defraud, then it is well laid in the indictment to be to defraud Carey, for he was the only person who in law could be defrauded.

The counsel for the prisoner thereupon made to the court the following requests to charge:

1st. The jury must be satisfied, before they can convict, that

the representation proven made by defendant to Carey was one to which "a person of ordinary caution would give credit." The judge refused to charge in this form, having already charged on this point, and the prisoner excepted.

2d. That the jury cannot convict for such representation, if they are satisfied, from the evidence, Carey had the means of detection of the false representation at hand. The judge refused so to charge, upon the ground that there was nothing in the case to call for it. Prisoner excepted.

3d. The jury cannot convict unless they believe the representation alleged to be false was such an ingeniously contrived fraudulent representation that Carey, in the exercise of ordinary prudence, could not guard against it. The court refused so to charge for same reason given as to the first request, and prisoner excepted.

4th. That as to the representation made by the defendant at Batavia, to Carey, at the first interview, the jury cannot take that into consideration if they are satisfied all negotiation was then broken off between prisoner and Carey, and those representations were not referred to and adopted again by prisoner in his subsequent conversations with Carey. The court complied with this request, and so charged.

5th. The jury cannot take into consideration the second representation testified to by Carey, as made by the prisoner at Batavia, it being, in substance, "the only incumbrance upon the land is the Kidder mortgage, and when that is paid off the land will be clear from incumbrance," because no such representations are charged in the indictment. The court refused so to charge. The prisoner excepted.

6th. They cannot take into consideration the representation made by prisoner on the 23d of June to Carey in Buffalo, it being "the mortgage is all right, and if not I will make it right," because no such representations are charged in the indictment. The court said, "this is so, except that you may consider them for the purpose of determining whether the previous conversations were adopted."

7th. The jury cannot take into consideration the represent-

ations made in Batavia, provided they believe those representations made then produced the payment of the money upon the check, inasmuch as the offense was all complete in Genesee county, and this court have no jurisdiction of the offense. The court charged that the prisoner could not be convicted under the first count, and then refused to charge further, to which refusal prisoner's counsel excepted.

8th. The district attorney having given proof not only of the giving of the check, but of the obtaining of the money thereon in the county of Genesee by prisoner, and the indictment averring the obtaining of the money, the obtaining of Carey's signature to the check cannot be, in this case, regarded as an offense. It is merged in the money realized thereon. The court charged same as in last request, and then refused to charge as herein requested. Prisoner excepted.

9th. The conditional contract to pay when Cross paid, under the proof in this case, is not such a written instrument as is contemplated by the statute. The court so charged, as requested, and also charged that the prisoner could only be convicted of obtaining the signature to the check.

10th. Before the jury can come to the conclusion that Carey has been actually defrauded, by means of any such representation, they must be satisfied by proof; and the burden of proving that fact is on the prosecution, that Carey will not get his money on the bond assigned to him, and on the guaranty of Moulton, when it becomes due. The court refused so to charge, and the prisoner excepted.

11th. That before the jury can convict, they must be satisfied Carey has no valid and good security for the amount of the check and conditional contract signed by him. The court refused so to charge, and the prisoner excepted.

12th. That if the jury are satisfied the meaning of the representations made by prisoner was, there were no other incumbrances on record than is shown by the certificate, then they should acquit him, unless they are satisfied prisoner knew, at the time of making such representations, the Luce mortgage

The People *v.* Sully.

was recorded. The court complied with this request, and so charged.

13th. The prisoner's counsel further requested the court to charge that, upon the whole proof, the jury cannot take into consideration the representations first made by prisoner to Carey. The court refused to so charge, having already charged upon this point under prisoner's fourth request. Prisoner excepted.

14th. That the jury cannot take into consideration, as evidence of the pretenses charged in the indictment, the representations testified to by Carey and Godfrey at the time both were present. The court refused to so charge, and the prisoner excepted.

The jury found a verdict of not guilty on the first, and guilty on the second count of the indictment.

The prisoner's counsel moved in arrest of judgment. The court denied the motion.

Whereupon the judgment was suspended, and the proceedings were removed into the general term of this court for review.

*Albert Sawin,* for the prisoner.

I. The judgment should have been arrested. The verdict is a *felo de se.* No judgment can be given. The jury have found the prisoner not guilty of the offense charged in the first count, and guilty of the offense charged in the second count, both counts charging the same offense, to wit, the obtaining the check.

It is clear that upon the first count the prisoner could have been convicted for obtaining the signature to the check. It was not necessary that he should have obtained *all* the valuables therein set forth. (1 *Chitty's Pl.*, 356; *Com. Digest, Tit. Pl. C.*, 33; *Bac. Abr., Title Pleas*, 1; *Vin. Abr., Title Dec.*; *Whar. Cr. L.*, 975; *Id.*, 208; *Campbell* v. *Rex*, 11 *Ad. & Ell., N. S.*, 100.)

If the second count had averred the pretenses therein set

forth to be certain *other* false pretenses, then this record diffi-
culty would not exist.

II. The bill of exceptions presents the following points:

*First.* The complainant testified, under objection and excep-
tion, that he relied upon the representations of the prisoner.
The jury must determine that from the facts — the circum-
stances attending the transaction.

*Second.* The district attorney offered in evidence a conver-
sation that took place in the prisoner's presence, between Luce
and Moulton, showing that Moulton desired Luce to postpone
the recording of his deed. This was objected to as irrelevant
and immaterial. It might show an intent to defraud Luce.
For that the prisoner was not indicted; therefore immaterial.

*Third.* The justice erred in not charging, as requested,
"That the representations testified to by Carey and Godfrey,
at the time both were present, should not be taken into consid-
eration by the jury *as evidence of the pretenses charged in the
indictment.*" The same point is presented by the fifth request.

*a.* The averments in the indictment of the pretenses (the
first count being withdrawn from the consideration of the jury,
need not for this purpose be examined), in the second count, are
as follows: "That the Cross mortgage was the only mortgage,
lien or incumbrance of any kind upon the premises therein
described; that it was a first and only mortgage, lien or incum-
brance upon the premises therein described, and was a *bona
fide* mortgage, and given for a part of the purchase-money of
said premises."

*b.* The pretenses proven were: "Prisoner said at this time
that the Kidder mortgage was the only incumbrance on the
land, and when it was discharged the land would be clear.
Prisoner said, get the Kidder mortgage discharged, and then
the property would be free from any other incumbrance.
Sully said if that was discharged the title would be perfect,
and there would be no incumbrance; and he did not believe
that was an incumbrance."

There is a variance in substance between the pretense laid
and that proven.

The pretense averred is : "The land is free from all incumbrances"—an absolute unconditional representation. The pretense proven being, "There is another mortgage, the Kidder, and when that is discharged, the land will be free from all incumbrances." (*Smith* v. *Brush*, 8 *Johns. R.*, 84; *Laurie* v. *Kneiss*, 10 *Johns. R.*, 140; *Town* v. *Winters*, 7 *Cow. R.*, 263; *Stow* v. *Knowlton*, 3 *W.*, 374; *Emery* v. *Miller*, 1 *Denio R.*, 208; *Rex* v. *Plutow*, 1 *Campb. R.*, 494.)

*Fourth.* The judge erred in charging, in substance (6th request), that the jury might take into consideration the words used by the prisoner to Carey in Buffalo, "it was all right, and promised if it was not all right he would make it all right," as evidence of the reaffirmation and adoption of the representations made at Batavia; for the simple reason (it being conceded no such pretense was in substance averred in the indictment), Carey does not pretend there was any reference to any former conversation between them.

The learned justice virtually charged the jury they might interpret those words as follows: "It is just as I told you, Mr. Carey, in our first interview at Batavia;" when Carey expressly says, he relied upon his promise to make it right if it was not right.

*Fifth.* The refusal to charge contained in 14th request was erroneous.

Carey says, that in effect he refused to buy the mortgage, and there was no agreement for any future negotiation; and there is no pretense there is any proof of any allusion to the representations then made in the future interviews.

*Sixth.* In this case all the representations were made in Genesee county. The money, the object of those representations, was obtained there. The prisoner, it will be conceded, can legally be convicted there, and nowhere else, for obtaining the money.

And whatever might be the law of the case, if Carey had not virtually delivered the money to the prisoner in Genesee county, the check being merely used as an authority to the cashier, as agent of Carey, to deliver the money to the pris-

oner; the money being obtained, the real offense is not the obtaining the signature to the check, and therefore the court should have charged as requested on that point.

*Seventh.* The important question in the cause is presented by the following exceptions.

1. The prisoner's counsel excepted to the charge, that the representations, *as a matter of law*, were within the statute.

2. The prisoner's counsel requested the court to charge, that upon the proof in the case, they must be satisfied the pretenses were of such a character as would be credited and relied upon by persons of ordinary caution. That element, together with the means of detection, &c., was excluded from the consideration of the jury. The jury were virtually instructed, if a man lies to another and obtains property by such lie—no matter how absurd it, the lie, may be—he is guilty under our statute, provided a reliance is placed upon the lie; and further, the jury were virtually instructed that in determining the question of such reliance, they need not take into consideration the prudence and caution of the complainant, nor the means of detection of the lie. The question in this State is not open; if any question is settled, this one is.

In the cases of *Young* v. *Rex* (3 *T. R.*, 102); *People* v. *Johnson* (11 *Johns. R.*, 292); *People* v. *Haynes* (11 *Wend. R.*, 562), the character of the pretense, whether calculated to impose upon persons of *ordinary* caution, was recognized as an essential element in the crime.

This was also recognized by Senator TRACY, in *People* v. *Haynes* (14 *Wend. R.*, 546), and the opinion of the chancellor in that case has never been adopted in any reported case since that time, while that of Senator TRACY has. (*People* v. *Williams*, 4 *Hill R.*, 9; *People* v. *Crissie*, 4 *Denio R.*, 529; *People* v. *Stetson*, 4 *Barb. R.*, 151.)

*Eighth.* The result of the theory of the judge in his charge and refusals to charge, was virtually to withdraw the essential element of the crime from the jury. They were virtually told, taking the law from the court, if the prisoner opened his mouth and spoke the words set forth in the indictment,

you will convict him without any reference to the circumstances indicating a want of caution on the part of, or a means of detection at hand by, the complainant.

*F. J. Fithian* (District Attorney), for the People.

I. It was proper to ask Carey if he relied upon the representations of the prisoner. Although that was a question for the jury, it was nevertheless competent for the witness to give evidence upon it.

II. The exception in the case, to what Moulton said in the presence and hearing of prisoner, is not well taken. It was material evidence on the question of intent.

III. The rulings of the court below, in the charge, and upon the requests to charge, were correct. (*People* v. *Johnson*, 12 *Johns. R.*, 291; *Same* v. *Haynes*, 11 *Wend. R.*, 557; *Same* v. *Same*, 14 *Wend. R.*, 546; *Same* v. *Williams*, 4 *Hill R.*, 9; *Same* v. *Sleddens*, 3 *Id.*, 169; *Same* v. *Crissie*, 4 *Denio R.*, 525; *Same* v. *Stetson*, 4 *Barb. R.*, 152.)

1st. The court charge, as a matter of law, that the pretenses alleged in the case, if proved, are within the statute. It is correct for the court to pass upon this; for when the facts are proved, whether or not they amount to a pretense within the statute, is necessarily a question of law.

2d. In this case, that the actual state of the title to the "Kidder Farm," and the incumbrances thereon, including the "Luce Mortgage," at the time of the making the alleged false pretenses, was as charged in the indictment, were not controverted on the trial. The only questions really *mooted* on the trial were, whether the prisoner made the representations charged, and whether Carey relied upon them. That the pretenses were *false* to prisoner's *knowledge* (if made), was not denied.

3d. The ruling of the court, that the representations under the disputed facts of this case were (if made) a pretense within the statute, does not necessarily bring up for decision the question in dispute between Senator TRACY and Chancellor WALWORTH in *People* v. *Haynes*. Because, in this case, the repre-

sentations are a pretense even within the rule laid down by the Senator. We have here got an "ingenious contrivance," an "unusual artifice," against which common sagacity and ordinary caution is not sufficient to guard.

4th. But it is submitted, that all Senator TRACY, in *People* v. *Haynes*, meant to decide (even if his opinion should be held to be law), was, that to bring a pretense within the statute, all that is requisite is, that it should be reasonable and probable upon its face, so that a man of ordinary prudence, having confidence in the person making it, would be likely to believe and act upon it. Or, in other words, that the alleged pretense must not be so *absurd and improbable* upon the face of it that no rational man ought to be deceived thereby. If Senator TRACY'S opinion goes further than this, it is clearly overruled by the subsequent authorities above cited.

5th. The above disposes of the 1st, 2d and 3d requests to charge.

6th. The court correctly refused to charge, as requested, in the 5th request of defendant's counsel. The *second* representation testified to by Carey is substantially like the first one, and in substance as set forth in the indictment. It was that the "Kidder mortgage" *was paid*, and no incumbrance, and to the same effect is the testimony of Godfrey.

7th. The ruling on defendant's 7th request to charge was correct, as the grounds of the request are not in accordance with the facts.

8th. The 8th request of defendant's counsel was properly refused. The prisoner was not on trial for obtaining the money, but for obtaining the *signature* to the check; and it is no answer to say he afterwards committed another offense in obtaining the money.

9th. The 10th and 11th requests to charge have no foundation in law. It is no answer to a criminal fraud to say that the person defrauded by false statements may, upon some contingency, obtain satisfaction for the property of which he has been defrauded.

10th. The ruling of the court upon the 14th request to

charge was correct. If the negotiation was not wholly broken off after the first representation, then those representations were a part of the *res gestae,* and proper to be considered by the jury.

11th. It is submitted there is nothing in the 15th request to charge. It is difficult to understand how the force of a representation is broken or destroyed, or made immaterial, because heard by a person other than the one defrauded.

*By the Court,* MASTEN, J. The prisoner was indicted, tried, and convicted, of obtaining the signature of one Trumbull Carey to a check for $2,000 upon the Bank of Genesee.

He now moves, under section 35 of the act relating to this court (*Laws* 1857, *vol.* 1, *page* 754), for a new trial, upon the ground that error in law was committed by the court upon the trial.

The indictment contains two counts. · The pretenses are laid substantially the same in both counts.

The first count alleges that the prisoner, by means of the false pretenses, obtained Carey's check, in writing, upon the Bank of Genesee, for $2,000, and also certain other contracts in writing, setting them out at large; also $2,000 in money, and $1,000 in bank bills, the valuable things and personal property of said Trumbull Carey, of the value, &c. It does not, in terms or in substance, charge *the obtaining of the signature of Carey to the check.*

The second count charges that the prisoner, by means of the false pretenses, obtained *the signature* of Trumbull Carey to a written instrument commonly called a check, setting it out at large. This count, in brief, charges that the prisoner presented to Carey a mortgage made by one Cross and wife to one Moulton, upon certain lands in Genesee county (which mortgage and lands are particularly described), and induced Carey to purchase the mortgage, and to affix and write his name and signature to the check, by falsely, &c., representing, with the intent to cheat and defraud Carey, that such mortgage "*was the only mortgage, lien or incumbrance of any kind upon*

*the premises in said mortgage described; that there was no other mortgage, lien or incumbrance, upon the premises therein described; that it was a first and only mortgage, lien or incumbrance upon the premises therein described, and was a bona fide mortgage, and given for part of the purchase-money of said premises."* It negatives specifically all of the pretenses in the words in which they are laid, and avers that "there was then and there another mortgage upon said premises to secure the payment of $5,250, dated the sixth day of May, 1859, executed and delivered by one William M. Moulton to one Truman Luce, and which said mortgage was then and there the first mortgage upon the aforesaid premises, and was the first and prior lien and incumbrance thereon. It then alleges that the prisoner knew of the existence, &c., of the mortgage of Moulton to Luce, and that his pretenses were false.

The prisoner was acquitted under the first count, and convicted under the second count.

I will examine the exceptions in the order in which they occur. The district attorney inquired of Carey, the dupe, whether he relied on the representations of the prisoner. This was objected to by the prisoner, on the ground that it called for the secret mental emotions of the witness. The court overruled the objection, and the prisoner excepted.

This was a material fact to be established by the public prosecutor, and certainly no one could speak to it better than Carey. The fact was sought after, and not the opinion of the witness. (*People* v. *Herrick*, 13 *Wend. R.*, 87.)

The district attorney offered to prove that while at Luce's house, at the time of the conveyance of the farm to Moulton, and the execution of the mortgage for the purchase-money by Moulton to Luce, Moulton, in the presence of the prisoner, told Luce that he need not be in a hurry to get his mortgage recorded; that in the course of a week Moulton would call upon Luce, and they would go together to the clerk's office and have the deed and mortgage recorded. The evidence was objected to as immaterial and irrelevant. This objection was properly overruled. It, in connection with the conduct

The People v. Sully.

and acts of the prisoner, had an important bearing upon the intent of the prisoner to cheat and defraud, at the time he made the representations to Carey alleged in the indictment. It tended to show not only an intent, but a conspiracy with Moulton to cheat·any one they could.

The next exception is to the charge "that under the circumstances of this case such a representation is a pretense within our statute."

This exception presents the question, whether it is an offense within our statute against false pretenses to effect a sale of a mortgage on real estate by falsely, willfully and designedly representing and pretending, with intent to cheat and defraud, that it is the first lien or mortgage upon the mortgaged premises, and thereby obtain money, &c., from the purchaser.

If this be not so, I have entirely failed to understand the statute. I am aware that in construing this statute there is a seeming conflict between some of the cases, at least in their *dicta*. This has chiefly arisen, I think, from not considering whether the case cited was upon an indictment under the statute, or upon one for a cheat at common law.

A cheat or fraud, to be a criminal offense at the common law, must be such a fraud as affects the public, and against which common prudence cannot guard, and must indicate a general intent to defraud.

But the statutory offense of which the prisoner was convicted, is complete when one is induced to put his signature to a written instrument, or to part with his property, by a false pretense or representation as to an existing fact, willfully and designedly made for the purpose of obtaining such signature or property, with the intent to cheat or defraud him; and it is not necessary that the pretense or representation should be such that common·prudence or ordinary care could not have guarded against it, or that it should be accompanied by any "artful contrivance," or that the mind of the dupe should be tempted to belief by "an artfully contrived story." It is sufficient if it be such (and such it must be), that, if true, it would naturally, and, according to the motives which in the affairs

of life influence the honest mind, directly lead to the result alleged. All men are not equally prudent or cautious, and the statute was passed for the protection of the weaker and more credulous and unsuspecting part of mankind. If, therefore, an assertion of the existence of such a fact be falsely, willfully and designedly made to induce another to part with his property with intent to cheat him, and the assertion accomplishes the object for which it was made, the offense under the statute is complete.

Two of the earliest cases reported in this State went upon this distinction. The one was an indictment for a cheat at common law; the other, an indictment under the statute. (*The People* v. *Babcock*, 7 *Johns. R.*, 201; *The People* v. *Johnson*, 12 *Johns. R.*, 292.)

In *Mc Queen* v. *Wickham* (10 *Adol. & Ellis*, 34; 37 *Eng. Com. Law*, 29), Lord DENMAN, in answer to the assertion that the device must be such as to impose upon a man of ordinary caution, said: "I never could see why that should be. Suppose a man has just art enough to impose upon a very simple person and defraud him, how is it to be determined whether the degree of fraud is such as shall amount to a misdemeanor? Who is to give the measure? There are, indeed, cases where the pretense is so very foolish that it is difficult to say that an imposition is practiced; but still, who is to give the measure?"

The plain answer is, that the jury are to give the measure. It is for them to say whether the prosecutor relied upon, was deceived by, and parted with his property upon the strength of the pretenses used. Any other construction of the statute would defeat the very object of its enactment, by leaving the weak and confiding at the mercy of the fraudulent and designing.

In the language of Mr. Greaves, in a note to *Russ. on Cr.* (*vol.* 2, *p.* 289), "as in robbery, it would be absurd to lay down any rule which defined the force necessary to constitute a robbery, with reference to the ordinary strength of mankind; so, in false pretenses, it would be equally absurd to establish a rule with reference to the ordinary capacity of mankind."

The character and nature of the pretenses, and how calculated they were to deceive the prosecutor, the prosecutor's habits and mental capacity are all proper to be considered by the jury in determining whether the prosecutor was deceived by them, and whether they were the operative cause of his parting with his property. An inexperienced youth or a feeble old man might be induced to part with his property by false pretenses, particularly if made by a person in whom he placed mistaken confidence, which would not engage the attention of a man of ordinary sagacity and prudence, and which a sharp and experienced man would see through at a glance. Which stands most in need of the protection of the law? and is not the law made for the weak? Take two men of " common prudence and sagacity," and the one is duped by that which would have obtained no credit from the other, and they each wonder at the credulity of the other.

It was contended, on the argument by the counsel for the prisoner, that the cases of *The People* v. *Williams* (4 *Hill R.*, 9), and *The People* v. *Stetson* (4 *Barb. R.*, 151), fully sustain him in his position. Some of the expressions in the opinions delivered in those cases, detached from the case, might seem to do so. Those cases were correctly decided. The prosecutor in each of them was a party to a highly immoral and criminal act, and that is the ground upon which those cases stand.

But I will pursue this discussion no farther, but content myself by declaring my entire concurrence in the construction given to the statute under consideration by Chancellor WALWORTH, in the able opinion delivered by him in *The People* v. *Haynes* (14 *Wend. R.*, 546).

In order to hold the case at bar to be within the statute, it is not necessary to give to the statute the scope and effect to which I have just declared its true construction entitles it.

We are of the opinion that the pretense laid in the second count of the indictment, and submitted to the jury, is within the statute, and that the exception is not well taken. The judge instructed the jury that the mortgage from Moulton to Luce was, and ever had been, a prior lien upon the Kidder

farm over the mortgage from Cross to Moulton. He submitted to the jury to determine whether the prisoner, during the negotiation of the sale to Carey of the bond and mortgage made by Cross to Moulton, represented to Carey that that mortgage was the only mortgage, lien or incumbrance upon the Kidder farm, or that there was no other mortgage, lien or incumbrance thereon; whether Carey relied upon and was duped by the representation; whether the representation was made with a knowledge on the part of the prisoner that it was false and with intent to defraud; and instructed them, if they should find all these facts against the prisoner, that, under the circumstances of this case, such representation was a pretense within our statute. The only part of the charge excepted to was, "that, under the circumstances of this case, such a representation is a pretense within our statute."

We are also of the opinion that the exceptions to his refusals to charge as firstly and thirdly requested, are not well taken.

We are also of the opinion that the exception to the refusal to charge as secondly requested is not well taken. There was nothing in the case to call for it. Certainly Carey did not owe to the prisoner the duty to go to the clerk's office and examine the records. Nor did (to use what seems to be a favorite expression) "common prudence" suggest that he should go; for the prisoner, by the search certified by the county clerk, had satisfied "common prudence" that nothing would be found there. There were no means at hand for detecting the false representation. But it seems to me to come with an ill grace from the prisoner, to say, you placed too much reliance upon my statements; if you had spent your time or money in investigating them, you might have discovered that they were false.

The next exception is to the refusal to charge as fifthly requested. The 15th request, also, will be considered here.

I think the jury would have been warranted in finding that the testimony was not in substance as it was assumed to be by the prisoner's counsel in his fifth request.

Carey testified that he had had an interview with the pris-

oner previous to the one pointed at by the 5th and 15th requests to charge. At the first interview, the prisoner offered to sell him the mortgage of Cross to Moulton, and told him it " was a good mortgage upon a farm in Darien of one hundred and eighty-six acres, which was free from incumbrances, except this (the Cross) mortgage; that there were no other incumbrances upon it but this mortgage; that it was the best kind of mortgage, a first class mortgage." Carey did not examine the county clerk's certified search at that time, but before the next interview with the prisoner he did, and found the Kidder mortgage upon it, and called prisoner's attention to it. Prisoner said "the Kidder mortgage was paid; he would get it discharged, and when it was discharged the land would be clear." It is sufficient if the pretense be proved in substance and in effect. The very words need not be used, and the pretense may be proved by the conduct and acts of the prisoner, in connection with his statements.

The jury would have been warranted in finding that, on the occasion alluded to, the representation of the prisoner, in substance and effect, was: there is no mortgage or incumbrance on the land other than the Cross mortgage; the Kidder mortgage, which appears upon the search, is no incumbrance in fact; it is paid, and when it is discharged the land will be also clear upon the record. No claim is anywhere made that the Kidder mortgage was not in fact paid. We think it would have been error to have charged as fifthly and fifteenthly requested.

The exceptions to the refusals to charge as seventhly and eighthly requested, are not well taken. The signature of Carey to the check was obtained in the city of Buffalo. Our statute makes it an offense to obtain " the signature of any person to any written instrument" by false pretenses. The check was an instrument within the statute. (*People* v. *Galloway*, 17 *Wend. R.*, 540.) It is possible that the prisoner could have been indicted and tried in Genesee county, for obtaining the money by means of the check. (*People* v. *Herrick*, 13 *Wend. R.*, 87.) But the statutory offense of obtaining the signature of Carey

to the check, was complete in Buffalo, and the prisoner could not, by persevering in his fraud to a fuller consummation of it, bar the offense committed by obtaining the signature. (*People* v. *Genung*, 11 *Wend. R.*, 18; *Commonwealth* v. *Wilgus*, 4 *Pick. R.*, 177.) There was no merger, for even if he could have been tried for obtaining the money upon the check, the offenses in the law are of the same degree. It is not material where the pretenses were made, the obtaining the signature or property by means of them, with intent to cheat or defraud, completes the crime, and determines the place of trial.

The judge properly refused to charge as tenthly and eleventhly requested. For it is not essential to this offense under the statute, that actual loss or injury should be sustained. (*People* v. *Genung, supra.*) The counsel says that the verdict of not guilty on the first count, and guilty on the second, is a *felo de se.* We are not able to see any difficulty or embarrassment in the verdict. The prisoner was put upon his trial for but one offense; and in such case, where there are several counts, it is competent for the jury to say under which count they convict, and to dispose of the other counts by acquitting upon them. The prisoner could not have been convicted under the first count, for obtaining the money through or by means of the check, for the money was obtained at Batavia, without the territorial jurisdiction of this court. He could not have been convicted under the first count, for obtaining the signature of Carey to the check, for he was not in that count charged with that offense. The charge was of obtaining Carey's written check upon the Bank of Genesee for $2,000, the said check being the personal property and valuable thing of said Carey.

It may be questionable whether the check was the personal property or valuable thing of Carey within the statute; but be that as it may, the prisoner could be convicted of but one offense, and so is the verdict.

Proceedings affirmed.